[No. 5873.  Decided March 2, 1906.]

PETER PEARSON, *Respondent,* v. FEDERAL MINING AND
SMELTING COMPANY, *Appellant.*[1]

MASTER AND SERVANT—NEGLIGENCE—ASSUMPTION OF RISKS—IN-
JURY TO MINER—PROJECTING TRIP IN SHAFT CATCHING CLOTHING—
QUESTION FOR JURY.  In an action for personal injuries sustained by
an employee in a mine, reasonable minds might differ, and the ques-
tion of the assumption of risks is for the jury, where it appears that
the plaintiff, an experienced miner, who was in charge of the cage
which delivered the miners to the different levels of the mine, was
injured through the fact that the clothing of one of the men on the
cage was caught while descending the shaft by a projecting "trip"
used for the purpose of dumping the ore loads into the ore pocket,
that although the plaintiff knew that the "trip" projected into the
shaft, and could hear it click every time the cage passed it, and that
at times it had caught the clothing of the men riding on the cage,
the shaft was dark, and the plaintiff had never seen the trip, had
nothing to do with placing the men properly in the cage, and the
same was daily used with safety.

Appeal from a judgment of the superior court for Spokane
county, Albertson, J., entered June 27, 1905, upon the verdict
of a jury for $1,000 damages sustained by an employee in a
mine.  Affirmed.

*Graves & Graves* and *B. H. Kizer,* for appellant.

*Robertson, Miller & Rosenhaupt,* for respondent.

MOUNT, C. J.—Action for personal injuries.  The plain-
tiff recovered a verdict for $1,000 in the court below.  De-
fendant appeals from a judgment entered on the verdict.  At
the close of plaintiff's case, defendant moved for a directed
verdict in its favor.  This motion was denied, and defendant
elected to stand upon the case made by the plaintiff.  The
case was thereupon submitted to the jury, and a verdict was
returned as stated.

Appellant relies upon but one point, which is that the trial

1Reported in 84 Pac. 632.

court erred in refusing to direct a verdict in favor of appellant, upon the ground that the respondent assumed the risk of the accident which caused his injury. The facts are these: Appellant was engaged in operating a mine in Idaho. Respondent was an employee working in the mine. This mine in which respondent was employed when injured was worked by means of levels running from a shaft. These levels were two hundred, four hundred, six hundred, eight hundred, and one thousand feet deep from the surface. To each of these levels a certain number of men were assigned in the work of getting out the ore. About twenty feet from the surface was an ore pocket or dump, to which the ore mined in the levels was hoisted through the shaft. Two shifts of men were employed; one shift working by day, the other by night.

In the shaft was a cage, which was used in hoisting ore from the levels to the ore pocket or dump above referred to, and in lowering and hoisting workmen to and from their work. The cage was made in three compartments or decks. The upper deck of the cage consisted of an iron car about six feet square and ten feet deep, called a "skip." It was capable of holding about five tons of ore, and was used exclusively for hoisting ore. The two lower decks were platforms for the workmen to ride upon. These decks were suspended from the skip, or ore car, by means of iron bars about two inches wide and eighteen inches apart. These bars came down on but two sides of the platforms, in an A shape. The other two sides of the platforms were open. The upper passenger deck was smaller than the lower one. The lower one held eight men. The upper one, being about one and one-half feet narrower, held but six men. When the men of a shift came to go to work, those working in the thousand-foot level were first sent down, being placed in position on the decks of the cage by the hoist man at the top of the shaft, eight men on the lower deck and six men on the upper deck.

In charge of the cage on the upper passenger deck was a

man called a "cager," who, when the cage had reached its destination and the passengers had gotten off, signalled the hoist man to draw up the cage. The cager remained on the cage, exercising these duties, until all the workmen of the shift were unloaded at the several levels. He then went about other work. When the cage was not in use in lowering and hoisting workmen, it was used for hoisting ore, by means of the skip or iron car, to the ore pocket or dump above referred to. At this pocket was a trip, consisting of a V-shaped piece of iron, projecting some two or three inches into the shaft but clearing the sides of the cage by about the same number of inches. When ore was being hoisted, a catch was turned so that the trip caught the iron car, causing it to turn and dump its load of ore into the pocket or ore dump. When workmen were using the cage, the catch was arranged so that the trip would not dump the car. The passenger decks as above stated cleared the trip, but the car struck it even when not arranged for dumping ore, making a clicking noise as the cage passed it.

When respondent was injured he was acting as cager in lowering the night shift of men to work. On the sixth or seventh trip down, while respondent was standing at his station on the upper passenger deck of the cage, and the cage was going rapidly down loaded to its limit with men, the clothing of a man named Farley, one of the workmen on the lower passenger deck, caught on the trip as the cage passed the ore pocket, and Mr. Farley was dragged from his place on the lower deck through the space between the lower and upper passenger decks, and then torn loose by the iron car as it came down, and his dead body was thrown upon the men standing on the upper passenger deck. The respondent was struck by Mr. Farley's body, bruised by his heavy shoes, and severely injured.

Respondent was an experienced miner, and had been employed in this mine for about eight months before he was injured. His work was as trammer for a period of about six

months, and as assistant cager for a period of about two months of that time. His work as trammer was pushing the ore cars on one of the levels. As cager or assistant to the cager, it consisted in riding on the cage and giving signals to the men at the hoist. These signals could only be given at the levels when the cage was not in motion. Respondent had been cager for about two months before his injury. In addition to the six or seven trips which he took each day in distributing the men to their places at work while he was cager, he had also ridden in the cage each day during the time he had been employed in the mine. He knew what the trip was like, its purpose and the manner in which it worked, and also where it was located in the shaft. He also knew when the cage passed it by its clicking noise. He also knew that it projected into the shaft and that other miners riding on the cage had caught their clothes upon it. He had once caught and torn his clothes upon it although he said he had never seen the trip. The shaft and cage were dark except at the openings of the levels into the main shaft. Light could not be carried on the cage on account of the draft caused by the rapid operation of the cage. At the time of the injury, respondent was on the upper passenger deck and on the side of the cage opposite the trip. Upon these facts appellant, apparently conceding that it was negligent in maintaining the trip in the condition described, contends that the danger of persons being caught thereon was apparent and known to the respondent, and was therefore assumed as one of the ordinary, obvious risks of his employment. The general rule is that, if the servant knows the danger, or if it is so patent that an ordinarily prudent person would see and appreciate it, and he continues in the master's service, he assumes the obvious risk; but if the defects in the machinery or appliances grow out of the want of ordinary care on the part of the master and are not so serious but that the appliances may be safely used with care and prudence, the master is liable where an injury occurs when the injured servant uses

the appliances with care. 20 Am. & Eng. Ency. Law (2d ed.), 126.

While the respondent in this case testified that he knew of the arrangement and location of the trip, and that he and others on different occasions had caught and torn their clothes upon it, we think it does not appear that the danger at the time of the injury was so patent that an ordinary person would see and appreciate it. The trip was not exposed where it could be seen. It was in the dark. While respondent heard it click against the iron car every time the cage passed it, he had never seen it. It had never done any more harm than to tear clothes prior to the time when he was injured. With care and prudence it could be, and was, passed daily with safety. Respondent, in order to avoid any danger, rode upon the opposite side of the car from the trip. The other passengers were placed upon the car by the man at the hoist. Respondent had no part in arranging these passengers in their positions, and he no doubt relied, as he had a right to do, upon the fact that the passengers were so placed by the master that the clothing of none of them would be caught upon the trip. Respondent stood upon the upper passenger deck on the side of the cage opposite the trip, where he was apparently perfectly safe. The cage and the shaft being dark, he had no opportunity to see and appreciate the danger of other passengers being caught and injured or hurled against him. He was careful for his own safety, and only assumed the risk which was apparent and obvious to him. If he had loaded the car, or if he might reasonably be held to have seen and appreciated the danger of other persons on the cage being caught upon the trip at the time of the injury, he no doubt would be held as a matter of law to have assumed the risk; but when it was shown that the cage was crowded to its limit so that he was unable to move from his position, that he was on the opposite side of the cage and upon another platform from the person who was caught and hurled against him, that the cage and the shaft were dark, so that he could

not see the other passengers or their positions upon the platform, that he was not required to place the passengers in position, and did not do so—these facts tend very strongly to show that the risk was not one assumed by him. He knew that the position of the trip made it liable to catch persons riding carelessly in the cage, yet with careful placing of the passengers and prudence in operating the cage, he also knew that the appliances were safe, because they were daily used with safety. The record does not show that Mr. Farley shifted his position upon the cage or that the passengers were loaded by a fellow servant or that respondent was negligent in any way. We have uniformly held that the question of assumed risk is for the jury where reasonable minds may differ upon it. *Christianson v. Pacific Bridge Co.,* 27 Wash. 582, 68 Pac. 191; *Shoemaker v. Bryant Lum. etc. Mfg. Co.,* 27 Wash. 637, 68 Pac. 380; *Gaudie v. Northern Lumber Co.,* 34 Wash. 34, 74 Pac. 1009; *Jancko v. West Coast Mfg. etc. Co.,* 34 Wash. 556, 76 Pac. 78; *Currans v. Seattle etc. Nav. Co.,* 34 Wash. 412, 76 Pac. 87; *DeMase v. Oregon R. & Nav. Co.,* 40 Wash. 108, 82 Pac. 170.

This case upon its facts falls within that rule. The judgment is therefore affirmed.

ROOT, DUNBAR, HADLEY, FULLERTON, and CROW, JJ., concur.