DETERMINED IN THE

# SUPREME COURT

OF

# WASHINGTON

[No. 10722. Department Two. April 12, 1913.]

S. P. JOBE, *Appellant*, v. SPOKANE GAS & FUEL COMPANY, *Respondent*.[1]

MASTER AND SERVANT—UNSAFE METHODS OF WORK—NEGLIGENCE—QUESTION FOR JURY. The negligence of a contractor engaged in blasting, in failing to adopt a reasonably safe method of work, is for the jury, where it appears that the battery used in discharging blasts was weak and repeatedly failed to work, that the blasts sometimes shot down, making it impossible to tell whether all had been discharged where more than one was exploded at a time, and the foreman used the battery on more than one blast at a time, after request that it be attached to one at a time as a matter of precaution.

SAME—ASSUMPTION OF RISKS—QUESTION FOR JURY. In such a case, an experienced powderman, injured by an unexploded blast, does not assume the risks, as a matter of law, but the question is for the jury, where, with knowledge of the master's negligence, he continued in the employment, but only after protest, allowing his judgment to be overridden by that of the foreman in charge; since the danger encountered was not certain, palpable and open, but was hypothetical only, and was not voluntarily entered upon.

SAME—CONTRIBUTORY NEGLIGENCE—QUESTION FOR JURY. An experienced powderman is not guilty of contributory negligence as a matter of law in exploding an unexploded blast with a steel drill, where he proceeded cautiously until the sand pump dropped down, an indication usually relied upon by experts that the blast had exploded and shot down.

Appeal from a judgment of the superior court for Spokane county, Easterday, J., entered May 15, 1912, upon withdrawing the case from the jury, dismissing an action for personal

[1]Reported in 131 Pac. 235.

injuries sustained by a powderman through a delayed explosion in blasting. Reversed.

*Laughon & Lavin*, for appellant.

*Danson, Williams & Danson* and *A. E. Gallagher* (*George D. Lantz*, of counsel), for respondent.

Ellis, J.—This is an action to recover damages for personal injuries. It is here on appeal from a judgment withdrawing the case from the jury and dismissing the action. We will therefore throughout designate the appellant as plaintiff, the respondent as defendant. The evidence in many particulars was conflicting. That, however, is immaterial to the present inquiry, since we must accord verity to the evidence most favorable to the plaintiff and give it its full probative effect.

There was evidence from which the jury might have found the following facts. The defendant was engaged in excavating a trench, about four feet deep, in the southern part of the city of Spokane, for the purpose of laying a gas main. Where the accident occurred the excavation was being made in a rock formation, the upper stratum eighteen inches to two feet in thickness being hard and solid; the lower portion to the bottom of the excavation being soft, friable and broken. The work was being done by blasting with Dupont gelatine powder, placed in drilled holes a little over an inch in diameter and about four feet deep. These charges were exploded by means of an electric battery attached to a firing wire connected with thin wires attached to caps embedded in the gelatine. When more than one charge was attached to the firing wire, they were all exploded by one application of the battery, the explosions being simultaneous so that but one report was made. In such case it was impossible to determine from the report whether only one, or more than one, or whether all the charges so attached had exploded. In a formation such as here encountered, it was not uncommon for the charge to shoot downward shattering the softer lower stratum of rock without breaking or noticeably disturbing the upper solid layer. In

such case, if more than one charge was attached to the battery when the electric current was applied, it was impossible to determine from the appearance of the surface whether more than one of the charges had exploded. Under these conditions, there was no way of determining whether any, and if any, which of the charges had missed fire, except by removing the tamping and exploring the holes.

The plaintiff, a man of many years' experience in blasting, had been, for some months prior to September 9, 1911, in the defendant's employ as a powderman, and on that date, and for two or three days before, had been working in the vicinity above mentioned. There were three crews of three men each engaged in drilling holes, the plaintiff being a member of one of these crews. His duties required him to assist in drilling the holes and to personally load the holes with powder, attach the thin cap wires to the firing wire, and operate the battery. Where the bottom of the hole was in soft rock or earth, a quantity of sand was first tamped therein, the sticks of powder then inserted one upon the other, three and a half sticks being ordinarily used, and the cap pressed into the last half stick. The remainder of the hole was filled to the top with sand, thoroughly tamped by means of a wooden stick.

On the day in question, some nine or eleven charges had been set off prior to the accident. While usually the plaintiff attached the cap wires to the firing wire and turned the crank on the battery to explode the holes, on the day in question the defendant's foreman in charge of the work, himself an experienced powderman, had personally attached the wires and manipulated the battery in discharging all but one of these charges. This happened as follows: On several occasions prior to this time, the battery had failed to explode charges attached to the firing wire. This occurred once on August 25, and again on August 30, 1911, when two charges had been attached and but one had exploded. On another occasion when so attached, the battery had failed at first to explode either charge, but without readjusting the wires, on turning

the crank several times, both exploded. These failures were attributed by the plaintiff and another experienced powderman to the weakness of the battery. Four or five days before the accident, the plaintiff had told the defendant's superintendent of construction, who had general charge of its construction work, that the battery was not working properly, and he had replied, "All right, I will see about it." On the morning in question, before the accident occurred, the plaintiff told the foreman in immediate charge of the work that no more than one charge should be attached to the battery at one time as the ground was soft at the bottom, that the battery did not work properly, and that he feared an accident. The foreman replied that he knew all about the batteries and he was in a hurry and wanted to get the muckers to work. Thereafter until the accident, the foreman made the connections and fired the charges himself.

The plaintiff had loaded the last two holes, about four feet deep and about three feet apart, in the manner above described. The foreman connected the wires and used the battery to explode the charges. After the report, when the logs which had been placed over the holes were removed and the dirt scraped away, both holes looked the same. The sand tamping was practically undisturbed in both. Neither hole had been affected on the surface. They looked alike. The foreman then said to the plaintiff: "They have both shot down and you will have to clean the holes out." The plaintiff began pumping the sand out of one of the holes with a sand pump, and when down about the depth of the tamping, the pump dropped about six inches, which the plaintiff and several other expert powdermen testifying for both plaintiff and defendant stated would indicate that the charge had exploded. Some pieces of rock had come in from the side of the hole, interfering with the work of further clearing it; but before attempting to remove this rock, the plaintiff proceeded to pump the sand from the other hole. The same thing happened. The pump sank down in the same way and rock had

also come in from the side of the hole. He took a drill and re-
moved the rock from this hole and then returned to the hole
first pumped out, and after attempting without success to re-
move the rock with a wooden scraper or spoon, used the drill
as before; and while he was cutting away the rock, the explo-
sion occurred, causing the injury. There was a conflict in the
evidence as to the extent of the explosion. The drill was not
thrown out of the hole. Some of the defendant's witnesses
testified that if the amount of powder placed in the hole had
exploded the drill would have been thrown out. Other wit-
nesses testified that the noise was about the same as any shot
which goes down and that in that character of ground the
drill would not necessarily be blown out of the hole by the full
explosion of the charge. The negligence charged was failure
to adopt a reasonably safe method of work, considering the
known character of the ground, in attempting to discharge
more than one blast at a time, and failure to furnish a reason-
ably efficient battery. The answer denied the allegations of
negligence and set up the affirmative defenses of assumed risk
and contributory negligence.

Was the defendant guilty of the negligence charged? In
the employment of inherently dangerous agencies, such as
powder or other explosives, it is the duty of the master to
exercise a degree of care for the safety of the servant com-
mensurate with the danger reasonably to be anticipated. 1
Labatt, Master and Servant, § 16; *Mather v. Rillston,* 156 U.
S. 391. It is not holding an employer to an unreasonable
duty to require him to take all reasonable care to reduce to
a minimum the hazards of an inherently hazardous employ-
ment. Any extra hazard, not necessary to the practical per-
formance of the work, which might be anticipated, and by the
exercise of reasonable care on the master's part, avoided, it
is the master's duty by the exercise of such care to eliminate.
"The correct juristic concept is that which is indicated by
the remark that 'reasonable care is care proportional to the
danger to be guarded against, and, in dangerous situations,

means great care.'" 1 Labatt, Master and Servant, p. 30, § 16. *Sprague v. New York & N. E. R. Co.*, 68 Conn. 345, 36 Atl. 791, 37 L. R. A. 638. This is especially true as applied to the plan or method of operation deliberately adopted by the master or his representatives. When that plan is inherently defective and unnecessarily dangerous, its adoption is negligence entailing a liability upon the master for resulting injuries.

"The accident was not caused by a mere oversight or negligent act appertaining to a mere detail; but it followed as a natural and necessary consequence of a defective plan and method of operation directed by the foreman, and being carried out under his immediate presence and under his personal direction and supervision. The plan or method of operation was a matter to be chosen and determined upon by the master or his representative; and when, as in this case, it was inherently defective and unnecessarily dangerous, the responsibility for any injury occasioned thereby must be laid at his door." *Ball v. Megrath*, 43 Wash. 107, 86 Pac. 382.

"It was the duty of the city in doing this work, confessedly dangerous and attendant with many risks, to do it in such a way as to reduce the danger to a minimum, and not increase it by careless and negligent methods of operation." *Blair v. Spokane*, 66 Wash. 399, 119 Pac. 839.

See, also, *Etheridge v. Gordon Const. Co.*, 62 Wash. 256, 113 Pac. 639; *Rogers v. Valk*, 72 Wash. 579, 131 Pac. 231; 1 Labatt, Master and Servant, § 118. In view of these principles, it seems plain that the question of the primary negligence of the defendant was, under the evidence, one for the jury. Had but one blast been attached to the battery at the time, as urged by the plaintiff, the noise of the explosion, or its absence, would have furnished a sure test as to whether the charge was still there or not. In rock of this character, where the blasts were liable to shoot down, the surface of the ground furnished no such test. Such a plan of operation was entirely compatible with the practicable performance of the work and would have exposed the plaintiff to no unnecessary danger. Had there been an explosion, he could have pro-

ceeded with perfect assurance of safety to clear out and re-charge the hole. Had there been no sound of an explosion, he could have merely pumped out the sand, superimposed above the old charge a new one, and exploded the whole, a plan described by expert witnesses as usual and safe in such cases.

There was evidence sufficient to sustain a finding that the battery was weak. It had repeatedly failed to do the work expected of it, and of this the master had been notified. Whether, where there is perfect connection, a current which will fire one blast will fire two or more up to the capacity of the battery and beyond that capacity will fire none, the evidence leaves in doubt. It may be doubted, therefore, whether the weakness of the battery had any causal connection with the failure of the charge to explode, which caused the injury. Whatever may be said of the second allegation of negligence, there was ample evidence to take the case to the jury upon the first. The plan of work adopted exposed the plaintiff to an unnecessary danger.

Did the plaintiff assume the risk of this added and unnecessary danger? The trial court, in deciding that he did, placed the decision upon the ground that, notwithstanding any prior negligence of the master, a new condition had arisen the dangers of which were equally within the knowledge of the plaintiff and the defendant's foreman, and that, therefore, the plaintiff acting upon equal knowledge with the master assumed the risk. This is unsound in that it ignores an ingredient essential to the assumption of extraordinary and unnecessary dangers created by the master's negligence, viz., that the added danger in order to be assumed must be patent, open, and obvious and voluntarily as well as knowingly encountered. Equal knowledge is not alone the test. The danger must be palpable and not only knowingly but voluntarily incurred. Herein lies the distinction between the assumption of ordinary risks necessarily incident to the work in the absence of any breach of duty on the master's part, and those arising from

the master's negligence. The servant assumes usually, as a matter of law, the risk of those ordinary dangers necessarily incident to the work, and only those. Whether he assumes the risk of unnecessary dangers imposed by the master's negligence, is usually a question of fact depending not alone upon his knowledge of the danger but upon its certainty, imminence, and obvious character, and upon his free and voluntary action in the premises as indicating an assent to the master's conduct and an acceptance of the consequent risk. Many cases make a distinction even more marked to the effect that the servant never assumes the risk of the master's negligence. We said in *Blair v. Spokane*, 66 Wash. 399, 119 Pac. 839:

"As to the defense of assumption of risk, while it is true that an employee assumes all the dangers inherent in the work and that are ordinarily incident thereto, it does not follow that he assumes the risk of his employer's negligence. The risks assumed by the servant are those, and those only, that are obvious after the master has discharged the duty imposed upon him by law of using ordinary care and prudence in making the servant's work reasonably safe, and in providing him with a reasonably safe place in which to do that work."

See, also, *Howland v. Standard Mill & Logging Co.*, 50 Wash. 34, 96 Pac. 686; *Curtis v. McNair*, 173 Mo. 270, 73 S. W. 167; *American Window Glass Co. v. Noe*, 158 Fed. 777.

Considered purely as a question of assumption of risk, unmodified by the element of assent to be deduced from the servant's free choice with knowledge and appreciation of the danger, the doctrine so stated is obviously sound; but with these modifying elements present and controverted, the doctrine is accordingly modified and the question becomes one of fact for the jury whenever the minds of reasonable men may differ upon it. *Pearson v. Federal Min. & Smelting Co.*, 42 Wash. 90, 84 Pac. 632; *Etheridge v. Gordon Const. Co.*, 62 Wash. 256, 113 Pac. 639; *Chicago Hair & Bristle Co. v. Mueller*, 203 Ill. 558, 68 N. E. 51; *Chicago & A. R. Co. v. House*, 172 Ill. 601, 50 N. E. 151; *Louisville & N. R. Co. v.*

*Kelley,* 63 Fed. 407; *Malott v. Hood,* 201 Ill. 202, 66 N. E. 247.

The danger here encountered by the plaintiff was not a certain, palpable, open and obvious danger. It was hypothetical. His continuance in the employment, with knowledge that the master's negligence in attaching, over his protest, more than one blast in this soft substratum had exposed him to an added, unnecessary possible danger, cannot be said, as a matter of law, to constitute a voluntary assumption of the added risk. A new danger was injected into his environment, with his knowledge, it is true, but over his objection. His judgment was overridden by that of the foreman, backed by the foreman's authority as such. The situation was the same, in legal contemplation, as if he had attached the blasts himself under a direct order from the foreman. The real danger lay in the uncertainty, caused by the master's negligence, as to whether there was any risk to assume. Whether this danger, though its presence was appreciated, was so imminent and certain of disastrous consequences as to make it incumbent upon the plaintiff as an ordinarily prudent man either to quit work or to assume the risk, was a question for the jury. He did not voluntarily encounter a certain, imminent and palpable danger, as was the case in *Waterman v. Skokomish Timber Co.,* 65 Wash. 234, 118 Pac. 36, and other cases relied upon by the defendant.

Finally, was the plaintiff guilty of contributory negligence in using the steel drill under the circumstances? Both he and the foreman believed that the charges had both shot down. He proceeded cautiously till satisfied that they had. Of five expert powdermen who testified both for the plaintiff and the defendant, all save one, the foreman, said in effect that when in pumping the sand out of the hole the pump dropped down below where the powder ought to be, they would conclude that the charge had exploded, and would deem it safe to use the drill in cutting out pieces of rock which could not be removed with a spoon or scraper. When asked how they would

have proceeded under like circumstances, they all prescribed a course of conduct practically the same as that pursued by the plaintiff. Whether, after having satisfied himself by the circumstance of the sudden dropping of the pump, a circumstance usually relied upon by other powdermen, that the charge had shot down, he was guilty of contributory negligence in using the drill, was a question for the jury. In the light of the evidence, we cannot say that the minds of reasonable men might not differ as to whether he acted as an ordinarily prudent powderman would have acted in the same circumstances. There was evidence sufficient to take the case to the jury upon every controverted issue.

The judgment is reversed, and the cause is remanded for a new trial.

CROW, C. J., MORRIS, MAIN, and FULLERTON, JJ., concur.