## Western Wrecking & Lumber Co. v. Patrick H. O'Donnell, Adm'r, etc.

1. MASTER AND SERVANT—*The Contract Establishes the Relation and Determines the Rights of the Parties.*—The duty of the master to a servant arises out of the contract between them; it establishes their relations and determines their rights.

2. SAME—*Tearing Down Old Buildings—Dangers Incidental to the Work.*—The work of tearing down an old building is necessarily attended with danger and the rule that it is incumbent upon the master to furnish the servant a reasonably safe place in which to do his work does not apply.

**Trespass on the Case.**—Death from alleged negligence. Appeal from the Superior Court of Cook County; the Hon. JOSEPH E. GARY, Judge, presiding. Heard in this court at the October term, 1901. Reversed and remanded. Opinion filed April 10, 1902.

J. B. LANGWORTHY, attorney for appellant.

FRANCIS J. WOOLEY, attorney for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

This is an appeal from a judgment for $1,750 recovered by appellee in an action on the case, for alleged negligence against appellant. The declaration avers, in substance, that June 26, 1892, the defendant (appellant here) was engaged in taking down a building at 373 Carroll avenue; that the plaintiff's intestate was a servant employed by the defendant as a laborer in and about the work of taking down the

building; that one Solomon I. Shane was the superintendent employed by the defendant, in charge of said work.

"That it thereupon became and was the duty of the defendant to use reasonable care not to send plaintiff's intestate into any place of danger with the risks of which he was unacquainted; that defendant then and there carelessly and negligently permitted a certain large and heavy beam which was partially removed from its fastenings and supports, to be and remain for an improper and unreasonable length of time in the said building, in a position where it was liable, by reason of any slight ordinary movement of the wind (jar or movement in the course of said work), to be dislodged and fall upon any workman who might be beneath or near the same, and then and there carelessly and negligently put the plaintiff's intestate at work near to and under said beam, and carelessly and negligently failed to inform plaintiff's intestate of said danger, of which danger plaintiff's intestate was then and there ignorant, by reason of which negligence of defendant, the said beam was (by some jar or movement in the course of said work) dislodged from its position, and fell upon the plaintiff's intestate, who was then and there in the course of his employment, at work with all due care and diligence, and in ignorance of said danger, whereupon plaintiff's intestate was killed."

The building in question was known as number 373 Carroll avenue in the city of Chicago, and is called by some of the witnesses a barn. It had been erected from twenty to twenty-five years before the accident. It fronted south on Carroll avenue, having a frontage on that avenue of about eighty-four feet, and a depth north from the avenue of about 150 feet. The building was from fourteen to sixteen feet in height, and had a flat roof. The front of the building was brick, and the rear was part frame. One witness testified that the brick part extended back about fifty feet; another, that it extended back eighty feet. There was a brick office in the southwest corner of the building, which extended back about twenty feet from the front. The roof of the building was supported by girders or beams, which girders were supported by posts. Some of the posts ran down into the ground and others rested on wooden sills, the sills being supported by posts driven into the ground. East

of the office at the southeast corner of the building, and about sixteen feet from the west wall, was a driveway about ten feet in width through which teams could pass into the building. The driveway extended north into the building about thirty-five feet, on a level with the ground or dirt floor, where it reached a short incline or ascent up to the floor of the building, which was about three feet above the ground level. East of the front door or entrance to the driveway, there was another front door, so that a team going north in the driveway could turn in the building and pass south through the east door and out of the building. In taking down the building, the roof was first taken down. The work of taking down was commenced at the southeast corner, was continued along the east side around the rear and back south on the west side of the building. The side of the part of the driveway next the office was boarded up, and between the office and the driveway there was a narrow walk, boarded. When the plaintiff's intestate was employed, and at the time of the accident, the entire building had been taken down except the front wall, the brick office in the southwest corner of the lot, certain posts hereinafter mentioned, and some of the flooring.

West of the driveway in the building a girder, which, with other girders which had been taken down, had supported the building, remained in its original position. The girder was about thirty feet long, about ten by twelve inches in size, and was composed of two timbers bolted together. The south end of the girder was supported by the north wall of the office. It was set into the wall, extending into it about six or eight inches. The upper surface of the girder was on a level with the top of the wall. North of the office the girder was supported by two posts, one at its north end, and the other about its center. The posts were about ten by twelve inches in size, and in height about fourteen feet above the floor of the building. The posts rested on a wooden sill which ran north and south, and which was itself supported by posts driven into the ground. There was flooring in the part of the building

west of the driveway and between the driveway and the west line of the lot. The flooring rested on joists running east and west, the material of the flooring running north and south. The sill on which the posts supporting the girder rested was about four inches below the floor, and the only lateral support which the posts had was the flooring around their lower ends.

June 22d, about nine or ten o'clock A. M., appellant was working from west to east, taking up the flooring of the building, and when, in doing that work, they came very near to the posts, the posts and girder fell toward the east, and the girder struck and killed the plaintiff's intestate. John Brimble was the name of plaintiff's intestate, and the evidence is that he was near the east side of the driveway and about forty feet from the front wall when struck. Hewitt, witness for plaintiff, testified that Brimble was standing, when struck, about forty feet from the front of the building and about thirty feet east of the west line of the building; that he was near the point where the incline of the driveway reached the floor level. Newton, witness for plaintiff and brother-in-law of Brimble, testified that he first saw Brimble at the place where he was killed about fifteen minutes before the accident. Andrew Johnson, defendant's witness, testified that Brimble was standing on the runway when struck. Shane, the superintendent, testified that Brimble was standing on the driveway when struck, about twelve feet east of the post, and that the girder or top piece struck him. Sanders, witness for defendant, testified that Brimble was sixty or seventy-five feet in from the sidewalk when struck.

The evidence shows that the girder was about thirty feet long and the office twenty feet in depth, making in all fifty feet from the front, and as the girder fell east, Brimble could not have been north of the north end of the girder when struck. It does not appear from the evidence that Brimble was doing any work when struck. The manifest weight of the evidence is that he was not. Hewitt testified : " At the time I looked over and observed what

I have stated, Brimble was in a stooping position, apparently picking up something, or at least he was stooping." Newton, brother-in-law of Brimble, testified : " Before the accident Brimble was doing something on the floor around there, just what I don't know." Johnson testified : " Brimble was not doing anything just as I looked at him. He was standing there. He was standing on the runway. There was no timber or planks around where he got hurt. There was nothing around there for him to pick up." Shane testified : " Brimble was doing nothing when he was injured; he was standing, apparently looking at the men taking up the planking back of the posts; he was looking in front of him."

The evidence is that at the time of the accident, employes of the defendant were engaged in tearing up the flooring, and that, in doing that work, they had come nearly if not quite to the posts. Hewitt, witness for plaintiff, and Shane, Johnson and O'Connell, witnesses for defendant, testified: Shane: " When I left these men that were working west of these posts, they were prying up the planking on the joists; that was about nine or a quarter after. I saw these men just at the time of the accident. They were taking up planking just at the posts." This witness also testified that he had not noticed Brimble, at any time prior to the accident, by or near the point where he was injured. Johnson testified: "At the time it fell there were two men to the west of the posts tearing up the floor." O'Connell testified: " When the beam first commenced to fall, there were two or three men working around there, tearing up the floor west of the posts." There is no evidence contradictory of the testimony of these witnesses, unless it be that of Newton, who merely testified that he could not see any floor around the foot of the posts, or any one working around them.

The evidence is that Brimble, deceased, was not directed to work at or near the place where he was injured. Newton testified :

" I was present when Brimble was hired the day before.

I asked Mr. Shane the day before if he would give a friend of mine a job. I said he was out of work. He said he would, and for me to bring him around. Brimble called at my house about seven o'clock, and I went over there with him. That was on Friday morning. We talked to Mr. Shane. I said, 'Here is the man I spoke to you about.' Mr. Shane said he could go to work. He put him to carrying joists from the rear end of the building."

Shane testified as to what occurred on the morning of the day of the accident, as follows:

" That morning I put him and a man by the name of Moro in the rear, to carry planks, joists and timber to the east part. I think Moro is now in Italy."

Shane also testified that he noticed Brimble about fifteen minutes before the accident carrying joists to the east from the north end of the building and piling them up.

" The only instruction I gave Brimble was to go to the rear and carry lumber in the northwest to the east, whatever there was left in the back part; pile the joists, timber and planking, so that when the wagons got there they could load up without mixing them."

This evidence is corroborated by that of other witnesses, and is uncontradicted. Johnson testified that before the accident Brimble was carrying kindling wood and planks away from the north end of the building, where the floor had already been torn up, over to the east side; that that was not anywhere near the point where the accident occurred; that it was 100 feet back from the office; that he saw him working there right along; but that for about ten or fifteen minutes next before the accident he had not noticed him. O'Connell testified:

" I heard Mr. Shane tell Mr. Brimble to pile up some lumber; to throw the kindling wood on one side. It was in the northwest part of the building. Shane and Brimble were right close to me, a few feet. He told him to pile the timber up there and throw the kindling wood to one side. This was in the northwest part of the building. This was about fifty feet from the posts. I saw Brimble working there that morning prior to the accident; that was about fifty feet north of the posts. Before the accident I saw Brimble last at this pile of lumber, about fifty feet north of

the posts. That was just a little while before the accident.
I would not say positively how long. That was the last
place I saw him working before the accident. As he piled
up the lumber on the north end of the building he threw
the kindling wood one side toward the east, and I piled it
up over there. With reference to throwing the kindling
wood and it being piled, Brimble worked in connection
with me."

There is no evidence contradictory of Shane's as to the
place where he directed plaintiff's intestate to work.

The duty of the master to an employe or servant arises
out of the contract between them. Jones v. Granite Mills
Co., 126 Mass. 84, 89.

As between master and servant, their contract establishes
their relations and determines their rights. Cooley on
Torts, 2d Ed., Sec. 531, p. 623.

It is averred in the declaration that Brimble was employed
by the defendant to work as a laborer in and about the
tearing down of the building. The work of tearing down
an old building, such as the one, in question, is almost neces-
sarily attended with danger, and in such case the rule that
it is incumbent on the master to furnish to the servant a
reasonably safe place in which to work, does not apply as
in ordinary cases. Clark v. Liston, 54 Ill. App. 578; Muel-
ler v. Schwecht, 62 Ib. 622; Richardson v. Anglo-Am. Pro-
vision Co., 72 Ib. 77; Chicago Edison Co. v. Davis, 93 Ib.
284; Armour v. Hahn, 111 U. S. 313.

Plaintiff's intestate must have known when employed by
the defendant that the defendant was engaged in tearing
down the building. He was employed to assist in that
work, and the defendant certainly did not owe to him the
duty of ceasing to tear the building down. It was obvious
to all, at the time Brimble was employed, that the work of
demolition was not completed; that the front wall was not
yet down; that some walls of the office were yet standing;
that the girder supported by posts had not been taken down,
and that all the flooring had not been taken up; and plaint-
iff's intestate must have known that the work of removing
these remaining parts of the building was in progress, and,

as is averred in the declaration, it was to assist in this very work that he was employed.  There was no danger in completing the work of demolition which was not as apparent to him as to his employer.  He was employed the morning next before the morning of the accident.  The work of taking down the girders which supported the roof had then so far progressed that only the girder which subsequently fell remained in its place.  Brimble contracted for employment on the premises as they were, and necessarily saw the parts of the building which remained, and we can not say that the defendant owed to him the duty of taking down the girder the very day he was employed, or that the omission so to do was negligence.  Defendant was engaged in tearing up the floor next to the posts which supported the girder when the posts fell.  This was a necessary part of the work, and probably caused the posts to fall.

But waiving the question whether the falling of the girder was a danger incidental to the work, and therefore a risk assumed by the deceased, the judgment must be reversed for the failure of the plaintiff to prove the material allegation in his declaration, that the defendant " carelessly and negligently put the plaintiff's intestate at work near to and under said beam."  Not only did plaintiff fail to prove this averment, but it was disproved by uncontradicted evidence —evidence that the place where the deceased was directed to work, and where he did the only work shown by the evidence to have been done by him, was at such a distance from the place of the accident that, had he continued to work there, he would not have been injured by the falling girder.

The judgment will be reversed and the cause remanded.