[No. 10844.   Department Two.   April 4, 1913.]

WILLIAM A. ROGERS, *Respondent*, v. ALBERT VALK, *Appellant.*[1]

MASTER AND SERVANT—NEGLIGENCE—SAFE PLACE—CHANGING CONDITIONS—TEARING DOWN BUILDINGS—METHODS OF WORK — QUESTION FOR JURY. The doctrine of safe place to work applies to the tearing down of old buildings, where the master does ·not exercise reasonable care, considering the nature of the work, to eliminate unnecessary dangers, or injects unnecessary dangers into the work or place; and his negligence is· for the jury, where it appears that his foreman, of thirty years experience, directed an inexperienced man to pull down with a hand line the remnants of a roof upon a floor upon which the man was standing, without making an inspection of the floor, and by a method which caused part of a heavy wall to fall upon the floor, causing it to give way, when the danger could have been obviated by removing the man and using a cable and team ordinarily used for such purposes.

SAME—ASSUMPTION OF RISKS—QUESTION FOR JURY. A workman without experience does not assume the risks, and is not guilty of contributory negligence, as a matter of law, in obeying the direct

[1]Reported in 131 Pac. 231.

command of the foreman to pull down the remnants of a roof upon a floor upon which he was standing; the floor being supported on three sides by brick walls and also by a chimney, and there being no evidence that there was a safer place for him to stand and do the work; since the added danger was not so open, obvious and imminent that a reasonably prudent man would not have obeyed the order, nor that injury must necessarily result from obedience.

Appeal from a judgment of the superior court for Spokane county, Hinkle, J., entered August 21, 1911, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by an employee engaged in tearing down a building.   Affirmed.

*Davis & Rhodes*, for appellant.

*Fred M. Williams* and *R. M. Webster*, for respondent.

ELLIS, J.—This is an action for personal injuries.   In November, 1910, the defendant Valk entered into a contract with defendant Spokane School District No. 81, for tearing down and removing the ruins of a brick high school building which had been partially destroyed by fire.   For the prosecution of the work, about seventy-five men were employed by the defendant, under the superintendence of a foreman.   Among these, the plaintiff, a common laborer, began work on the 12th day of November.   The fire had destroyed a large part of the floors, but had left of the third floor in the southeast corner of the building a part covering a space which, so far as we are able to gather from the evidence, was about twenty feet square and supported by the south and east walls of the building on two sides, while the inner part was sustained by a chimney which had originally extended from the basement through the roof of the building, and was located at or near the inner corner of the remaining piece of floor.   Two witnesses testified that the floor was supported also on the west side by an inner partition wall.   While this remaining floor seems to have been damaged by fire, it was apparently considered by the foreman and the laborers as sufficiently strong for the men to work upon in removing parts of the wall above

it and fragments of roof.  The roof of the building had con-
sisted of timbers overlaid with slate, and there was a part
remaining at the southeast corner after the fire which had been
the covering over a dormer closet or window.  This remnant of
roof was sustained by a main rafter called a hip rafter, ex-
tending about sixteen feet over the third floor, and at a dis-
tance above the floor variously estimated at from ten to
fifteen feet.

As a part of the equipment for the work, the defendant
had on the ground and in general use a wire cable of sufficient
length to reach to the top of the walls and operated by a
team of horses and a capstan or drum, which cable was used
to pull down the brick walls or portions thereof.  Shortly
prior to the accident complained of, the foreman had caused
this cable to be adjusted to the fragment of roof above
mentioned, intending to pull it down, but fearing that, by
reason of the timbers being firmly attached to the outer wall
or gable of the dormer, the wall would also be thrown down,
caused the cable to be removed, and sent a laborer to cut away
the main or hip rafter and the upright supports of the dormer
roof.

Late in the afternoon of November 21, the ninth day of the
plaintiff's employment, and while he was at work on the third
floor above mentioned, the foreman came up and directed the
plaintiff and some fellow laborers to throw a rope over the
end of the main rafter, which projected diagonally over the
floor, and by means of the rope to pull the fragment of roof
down.  The evidence fairly shows that the foreman instructed
the plaintiff to secure a particular rope and where to find it
and use it for pulling down the roof, and thereafter immedi-
ately went below.  The plaintiff procured the rope as direct-
ed, and he and two fellow laborers, after some difficulty,
placed the rope over the end of the rafter and then, standing
on the floor with the plaintiff nearest the middle of the floor,
the three together pulled on the rope, and the roof fell, carry-
ing with it a part of the outer brick wall or gable.  Under

the weight of this roof and the mass of bricks, the floor gave way and fell through the two floors below to the basement, carrying the plaintiff with it and inflicting the injuries complained of.

At the close of plaintiff's evidence, a motion for nonsuit was made and overruled. The verdict was for the plaintiff. Each of the defendants moved for judgment notwithstanding the verdict. The motion of the school district was granted. That of the defendant Valk was denied. Judgment was entered upon the verdict, and he has appealed.

The appellant has made ten assignments of error, but they are all directed to, argued, and may be by us considered, under three heads. It is argued, (1) that there was no evidence of negligence or any violation of duty on the appellant's part; (2) that the respondent assumed the risk of the danger which resulted in his injury; (3) that the respondent was guilty of contributory negligence.

The negligence charged was that the appellant failed to exercise reasonable care to furnish the respondent a reasonably safe place in which to work, and that the plan of work adopted was unnecessarily dangerous. The appellant contends that the safe place doctrine is not applicable where the conditions of work must of necessity be constantly changing as in the tearing down of an old building. Two cases are cited in which the doctrine is broadly stated that "the work of tearing down an old building . . . is almost necessarily attended with danger, and in such case the rule that it is incumbent on the master to furnish to the servant a reasonably safe place in which to work does not apply as in ordinary cases." *Western Wrecking & Lumber Co. v. O'Donnell*, 101 Ill. App. 492; *Merchant v. Mickelson*, 101 Ill. App. 401. While the rule thus broadly stated is supported by these and many other authorities from other jurisdictions which might be cited, it has never been adhered to by this court and seems to us as indefensible in logic as it is pernicious in practice. It ignores the humane considerations which under-

lie the rule.  The safe place doctrine is the correlative of the
doctrine of assumption of risk.  The one cannot be defined
without a clear apprehension of the scope of the other.  The
servant assumes those risks which are open and obvious and
necessarily incident to the work, but only those.  The master
is chargeable with the result of dangers by him unnecessarily
injected into the work or place of work.  The safe place
doctrine simply stated is just this:  It is the duty of the
master to exercise reasonable care, considering the nature of
the work in hand, to eliminate from the place of work unnec-
essary dangers; that is to say, it is his duty to use reason-
able care to make and keep the servant's environment rea-
sonably safe so far as compatible with the practical per-
formance of the work.  It seems neither logical nor humane
to hold that, while ordinarily it is the duty of the master
to exercise reasonable care to eliminate unnecessary dangers,
still where the necessary dangers are more numerous by reason
of the nature of the work, and because they are by the con-
stantly changing conditions necessarily augmented from time
to time, therefore the master is absolved from the exercise
of any care to eliminate the unnecessary dangers.  The true
distinction is, we believe, that announced in *McLeod v. Chi-
cago, Milwaukee & P. S. R. Co.*, 65 Wash. 62, 117 Pac. 749,
where we said:

"It is next contended that the safe place rule has no appli-
cation to the situation here presented, because the false work
was being removed and the conditions were necessarily chang-
ing and dangerous, as in the construction, demolition or re-
pair of a building.  But the servant does not assume the risk
of every danger even in such cases.  As in other cases, he
assumes the risk of such dangers only as are necessarily
incident to the work.  The difference is not in the rule but in
the greater number of dangers incident to the work.  The
real question in any case is as to what constitutes reasonably
careful conduct on the part of the master looking to reason-
able safety for the men."

In *Liedke v. Moran Bros. Co.*, 43 Wash. 428, 86 Pac. 646, 117 Am. St. 1058, we expressed the same view as follows:

"If it is a master's duty to furnish the servant a safe place in which to work, it is just as much his duty to furnish that safe place, where the work to be performed is the demolition or tearing down of a building, as where it is its construction in the first instance."

See, also, *Etheridge v. Gordon Const. Co.*, 62 Wash. 256, 113 Pac. 639.

Under the rule so stated, whether upon the evidence the appellant was guilty of negligence was a question for the jury. The foreman was a man of thirty years' experience in the construction and demolition of buildings. The respondent had had little experience in such work. The floor in question seems to have been reasonably safe for the men to walk over and work upon, but not for the precipitation upon it of the roof of the dormer and bricks of the gable. The foreman testified that the weight of the hip or dormer roof falling "would not have affected the floor any," but that when the gable wall fell also, it caused the fall of the floor. That he appreciated this danger beforehand is evidenced by the fact that he ordered the timbers of the roof, which were imbedded in the wall, cut away. Yet when he ordered the men to pull the roof down with a hand line, he made no inspection to see if these timbers had been sufficiently cut. The evidence tends to show that he called the men away from the cutting of these timbers before that work was completed. He also testified that there was a certain narrow strip of floor to the west of the partition wall supporting the west side of the floor where the men stood, upon which they might have stood with safety in pulling the roof down, but he did not call the respondent's attention to this, and there is no evidence that the respondent knew that this strip was any safer than the rest of the floor. In fact, the evidence as to the existence of this safe strip is vague and unsatisfactory. The evidence shows that the roof could have been pulled down with the cable

provided for and ordinarily used for such work with perfect safety to the men. One of the men who claims to have assisted the respondent in pulling the roof down testified that he suggested the use of the cable, but the foreman said, "No, you can pull it all right with the rope." The foreman denied this, and also denied that the man in question was there at all. But the credibility of the witnesses was clearly for the jury. In view of these things, it was for the jury to say whether, by the plan of work adopted or by the failure to tell the men of a safer place to stand, of which there is no evidence that they knew, the foreman did not inject into a necessarily hazardous work an added and unnecessary danger. Unquestionably it was the duty of the foreman, as representing the master, to inspect and satisfy himself that the floor would sustain the added weight, or to direct the respondent to a reasonably safe place to stand, if there was such a place, while performing the order. If neither of these courses would furnish reasonable safety, then it was the master's duty to use the cable as usual, or adopt some other reasonably safe plan. The failure to do any of these things was a failure to exercise reasonable care.

The next question is, Did the respondent assume the risk of this added danger as a matter of law? He was acting under a direct order from the foreman. The rope used, which was only thirty or forty feet long, was the specific rope which the foreman directed to be used. He knew that with such a rope the men must stand somewhere upon the floor to do the work as ordered. If there was a safer place to stand than where they stood, there is no evidence that the respondent and the other two men knew of it, and the evidence is positive that the foreman did not tell them of it though he claims to have had it in mind. In executing the foreman's order, the respondent proceeded exactly as he was warranted in interpreting that order. In such a case, the questions of assumption of risk and contributory negligence approach each other so closely as to blend and be determinable upon

the same principles. The servant assumes the risk of obedience, or is guilty of contributory negligence in obeying the order, only when the added danger so incurred is open, patent and obvious alike to man and master, and so plain that reasonable men might not differ as to its existence, and so imminent that a reasonably prudent man would not obey the order.

"In other words, if a danger is not so absolute or imminent that injury must almost necessarily result from obedience to the order, and the servant obeys the order and is injured, the master will not afterwards be allowed to defend himself on the ground that the servant ought not to have obeyed the order." 1 Labatt, Master and Servant, p. 1241, § 439.

See, also, *Waterman v. Skokomish Timber Co.*, 65 Wash. 234, 118 Pac. 36; *Withiam v. Tenino Stone Quarries*, 48 Wash. 127, 92 Pac. 900; *Campbell v. Winslow Timber Co.*, 66 Wash. 507, 119 Pac. 832; *Offutt v. World's Columbian Exposition Co.*, 175 Ill. 472, 51 N. E. 651; *Gundlach v. Schott*, 192 Ill. 509, 61 N. E. 332, 85 Am. St. 348. Considering the fact that the floor was supported on three sides by brick walls and also by the chimney, and the evident belief of the experienced foreman, as implied by his order, that the floor would sustain the added weight which the execution of the order would obviously impose, we cannot say that reasonably prudent men might not well differ as to the danger which would result from obedience to the order. The question of assumption of risk was one for the jury.

The respondent was not guilty of contributory negligence in obeying the order unless there was a safer place to stand, and he knew of that fact. Of this, there was no evidence so conclusive as to take the question from the jury. If there was a more secure strip of floor on which he might have stood, there was no evidence that he knew of it. It is suggested that he might have stood upon the fire escape, but there was absolutely no evidence that such a course would have been

practicable.   It is also suggested that he might have stood
upon the wall of the building, but this was obviously imprac-
ticable.   When the dormer gave way in response to the pull,
the danger of falling from the wall would seem more obvious
than the danger that the floor would fall.   Upon the whole
record, it seems to us that the questions of negligence, con-
tributory negligence, and assumption of risk were all for the
jury, under proper instructions.   The instructions   given
fairly covered the law as we conceive it to be as applied to
the facts.

The judgment is affirmed.

MAIN, FULLERTON, MORRIS, and MOUNT, JJ., concur.