[No. 10687. Department Two. April 28, 1913.]

WALTER WILLIAMS, *Respondent*, v. THE CITY OF SPOKANE, *Appellant*.[1]

MASTER AND SERVANT — INJURIES TO SERVANT — NEGLIGENCE—UN-SAFE METHODS OF WORK—EVIDENCE—SUFFICIENCY. There is sufficient evidence of negligence in adopting an unsafe method of removing concrete forms from piers, where, as the work progressed and the top of the piers narrowed, the same long timbers were used to hold the forms as were used at the base, the necessary support of one of the rods embedded in the concrete was removed by the narrowing of the pier, and there was evidence that no block or tackle or other necessary appliance to support was provided by the engineer in charge prior to ordering men to go upon and remove the same, and the projecting timbers unnecessarily added to the weight and augmented the dangers.

SAME—ASSUMPTION OF RISKS—CONTRIBUTORY NEGLIGENCE—QUES-TION FOR JURY. In such a case, a workman does not assume the risks, and is not guilty of contributory negligence, as a matter of law, where in going upon the forms, he acted in obedience to a direct order of the foreman in charge, and had no particular knowledge of the tensile strength of the rods supporting the forms, and performed the work as it had theretofore been done while four rods in the cement formed the support, without any knowledge, or means of ob-serving, that, for the first time in the progress of the work, only three rods were embedded in the cement to support the forms.

DAMAGES—PERSONAL INJURIES—EXCESSIVE VERDICT. A verdict for $9,750, for personal injuries sustained by a bridge carpenter, 31 years of age, in a fall from a high pier, is not excessive, where the bones of one leg and ankle were shattered, muscles were torn away and re-moved, a rib was fractured, resulting in adhesion of the serous mem-brane of the lung cavity and interference with respiration and in-ducing painful recurrence of a pleuritic condition, the condition being permanent.

[1]Reported in 131 Pac. 833.

Appeal from a judgment of the superior court for Spokane county, Yakey, J., entered October 20, 1911, upon the verdict of a jury rendered in favor of the plaintiff, for $9,750, for personal injuries sustained by a carpenter engaged in the construction of a bridge. Affirmed.

*Cannon, Ferris & Swan* and *A. M. Craven*, for appellant.

*Samuel T. Crane, Robertson & Miller*, and *T. J. Corkery*, for respondent.

ELLIS, J.—This is an action for personal injuries, claimed to have been suffered by the plaintiff through the negligence of the defendant, city of Spokane, in connection with the construction of the Monroe Street Bridge in that city. The bridge was being constructed by day labor, and the plaintiff was one of the bridge carpenters employed upon the work. The southerly span of the bridge consisted of concrete piers, which were being built by pouring the concrete into forms of wood. These forms were constructed in sections sixteen feet long by eight feet high, in the following manner: the boards which formed the inner surface against which the concrete was poured were spiked or bolted to two by eight inch timbers placed edgewise against the boards, and back of these were two eight by eight inch timbers spiked or bolted to the two by eights to which the boards were nailed. Each of these sections weighed about 1,400 pounds. The base of the pier was thirty-two feet long by something less than thirty feet wide, but as it rose, it narrowed in length at the rate of four inches to the foot. At the base it required two sections of form to reach the length of the pier. Three sets of form were used for the work, one superimposed upon the other, and when the concrete had been poured into these three sets and sufficiently hardened, the lower set would be removed by sections, raised above the other two, and placed in position and filled with concrete, when in turn the then lower set would be removed and replaced above in the same manner, this process being repeated as the pier arose in height. These sections were held

in position by rods of corrugated iron about seven-eighths of an inch square, passing through the outside forms on either side, with a nut and washer screwed firmly against the heavy eight by eight timbers, thus holding in position the forms on the outside of the pier and drawing them against the ends of the forms on the slanting surface of the inner sides of the pier, making a complete box into which the concrete was poured. These bars extended six to eight inches beyond the forms. The whole work of constructing the bridge was under the general supervision of an engineer, and different parts of the work were under the direct supervision of foremen. The foreman in charge of the construction of this pier was one Beardsley, whose duty it was to direct the men in all of the work in connection therewith.

Down to this point there was practically no divergence in the testimony. As to the manner of removing the sections for the purpose of replacing them on top of the remaining forms, there was a sharp conflict. The plaintiff's testimony and that of the witnesses who testified in his behalf was clear and positive to the effect that, when the foreman was ready to have these forms removed, he would direct two of the workmen to descend upon the eight by eight inch pieces, take off the nuts and washers, and with a steel bar pry the sixteen foot section of form from the concrete and out a short distance upon the rods passing through the forms and embedded in the concrete. After this, either by means of a block and tackle or by means of ropes or chains attached to a conveyor called a "traveler," which passed over the entire structure, the sections would be either lowered to the ground until such time as they were ready to be replaced above the remaining sections, or would at once be raised and placed in position as parts of the form for the next pouring of concrete. The plaintiff and the witnesses testifying in his behalf all stated that neither the block and tackle when used, nor ropes from the traveler when it was used, nor other supports of any kind, were ever attached to these forms until after they had

been loosened from the concrete and pushed out from one to four inches from the face of the concrete. Witnesses testifying on behalf of the city stated that usually the block and tackle, or the ropes from the conveyor, or ropes tied to the forms above, were attached to these sections before they were loosened from the concrete.

On the morning of the 31st day of May, 1910, the plaintiff and one McNeill were ordered by the foreman to descend upon the lower of the three sets of forms, then in position some sixty-eight feet above the ground, loosen these lower sections from the concrete, and shove them out upon the rods a few inches preparatory to replacing them above the two remaining sets. The nuts and washers had been previously taken off by another workman. At this point the pier had narrowed in length until it was only about twenty-five feet long, but under the direction of the foreman, the same long sections of form were used as had been used at the commencement of the work, so that the outer sections projected beyond the pier a distance of eight or nine feet, leaving only the inner part of the section for a distance of seven or eight feet against the concrete. Four rods were used to each sixteen-foot section of form, and those which passed through the concrete were allowed to remain after the work was completed. At the time in question, by reason of the narrowing of the pier, the two inner rods of the outer section of form and the lower one of the two outer rods were wholly within the concrete, while the upper of the two outer rods was outside the concrete and passed merely through the forms on either side of the pier. Prior to that time the pier had been long enough to include all four of the connecting rods within the concrete. Where the sections of form joined each other it was usual to nail boards called "scabs" to prevent the concrete from passing out, and to make a more perfect joint.

In compliance with the order of the foreman, the plaintiff and McNeill descended upon the lower and outer section of form, and McNeill, sitting upon the outer end of the upper

eight by eight timber, sawed the scab in two which joined this section with the one above it, while the plaintiff, sitting at the other end of the section on the lower eight by eight beam, was engaged in prying away the scab connecting that end with the next section of the same set. There was evidence tending to show that these men had pried this section on which they sat loose from the concrete at the upper part, and out upon the rod for a distance of about one inch. While the men were engaged in removing these scabs, the form suddenly settled, bent the ends of the rods on which it was hanging, slipped off and fell to the ground, carrying the two men with it, injuring the plaintiff.

The negligence charged was that the defendant adopted an improper and unnecessarily dangerous method of performing the work; that the work was carried on without sufficient supervision; that there was a failure to guard the men while at work by securing the forms so as to prevent them from falling; that the foreman in charge of the work was incompetent; and that the foreman, having caused one of the rods to be placed outside the concrete without the knowledge of the plaintiff, failed to notify him of that fact, or to warn him of the added danger of the form falling by reason of its being sustained upon the ends of only three rods instead of four as usual. The defendant denied all the allegations of negligence, and interposed the affirmative defenses of assumption of risk and contributory negligence. At appropriate times, the defendant moved for a nonsuit and for a directed verdict, which motions were overruled. The jury returned a verdict in favor of the plaintiff for the sum of $9,750. The defendant's motion for judgment notwithstanding the verdict was overruled. Judgment was entered upon the verdict, from which the defendant appeals.

There are twenty assignments of error, but all, save the claim of excessive damages, present but three questions, the answers to which will be determinative of the case: (1) Was the appellant guilty of any negligence charged? (2) Did

the respondent assume the risk? (3) Was the respondent guilty of contributory negligence?

(1) That it is the duty of the master to exercise reasonable care to furnish the servant a reasonably safe place of work, and to keep that place reasonably safe, is law so familiar as to require no citation of sustaining authority. In the prosecution of an inherently dangerous enterprise, reasonable care is care commensurate with the danger reasonably to be anticipated. In such a case reasonable care "means great care." 1 Labatt, Master and Servant, p. 30, § 16; *Sprague v. New York & N. E. R. Co.*, 68 Conn. 345, 36 Atl. 791, 37 L. R. A. 638; 1 Thompson, Negligence, § 25.

"This is especially true as applied to the plan or method of operation deliberately adopted by the master or his representatives. When the plan is inherently defective and unnecessarily dangerous, its adoption is negligence entailing a liability upon the master for resulting injuries." *Jobe v. Spokane Gas & Fuel Co.*, ante p. 1, 131 Pac. 235.

See, also, *Ball v. Megrath*, 43 Wash. 107, 86 Pac. 382; *Blair v. Spokane*, 66 Wash. 399, 119 Pac. 839; *Etheridge v. Gordon Const. Co.*, 62 Wash. 256, 113 Pac. 639; *Rogers v. Valk*, 72 Wash. 579, 131 Pac. 231; 1 Labatt, Master and Servant, § 118.

What is reasonable care in a given situation, whether as applied to the question of the defendant's negligence or that of the contributory negligence of the plaintiff, is always a question for the jury, whenever, upon the evidence, reasonable minds might reach different conclusions. 1 Thompson, Negligence, § 425; *Richmond v. Tacoma R. & Power Co.*, 67 Wash. 444, 122 Pac. 351.

An application of these principles to the conflicting evidence presented by the record makes the question of the appellant's negligence clearly one for the jury. All of the respondent's witnesses who testified upon the subject stated that from the beginning and throughout the work the forms were loosened from the concrete and shoved out an inch to four

inches upon the projecting rods before attaching the tackles
or conveyor, and without tying them to the forms above,
and without other support than the projecting ends of the
four rods embedded in the pier. One of the appellant's wit-
nesses confirmed this, and testified that neither tackle, con-
veyor nor ropes were ever used without direction from the
foreman. The superintending engineer testified in effect
that the men would have no right to use the tackle or the
traveler without specific direction from the foreman. There
was no evidence that ropes were supplied to the two men on
the day in question, but there was evidence that tools and
appliances could not be secured from the supply house with-
out a specific order from the foreman. The foreman testi-
fied that the tackle was already adjusted to the pier and
hanging near the men, but this was contradicted by nearly
every other witness. He also testified that he directed the
respondent and McNeill to attach the tackle before loosen-
ing the form, but this was denied by both of these men and
by another man who was present when the order was given
to loosen the forms. He further testified that the forms
were never loosened or shoved out upon the rods or even the
nuts and washers removed without first attaching tackle, or
conveyor, or tying to the upper form with ropes, but he was
contradicted in all this by four or five witnesses.

It must be conceded that if the plan adopted was to loosen
the forms and shove them out without other support than the
ends of the rods, that plan was unnecessarily dangerous. It
must also be conceded that when but three of the four rods
were embedded in the concrete, that unnecessary danger was
further and greatly unnecessarily augmented. As one ex-
pert witness testified, the sustaining force would not only be
greatly diminished, but would be unequally distributed, so
that a slight movement of the top of the heavy form from
the face of the pier would tip the form, bend the rods and
cause it to fall. It is obvious that, being sustained by only
one rod at the top and two at the bottom, any loosening

of the form from the concrete would tend to cause it to
tip out at the top. Moreover it was obviously false economy
to use these long sections which projected more than half
their length beyond the pier. This injected another element
of unnecessary danger. If the respondent's witnesses are
believed, the appellant's negligence in exposing the respond-
ent to unnecessary danger was amply established. Their
credibility was for the jury.

(2) Did the respondent assume the risk? That the ser-
vant ordinarily assumes, as a matter of law, the risk of those
dangers which are open and obvious and necessarily incident
to the work is also so well established as to require no citation
of authority. Whether he assumes the risk of extraordinary
dangers resulting from an unnecessarily dangerous plan of
operation adopted by the master is dependent upon the open-
ness, obviousness, and imminence of the danger, and upon his
appreciation or lack of appreciation of it. The question
becomes one of fact for the determination of the jury, when-
ever the minds of reasonable men may differ upon it. *Pear-
son v. Federal Min. etc. Co.*, 42 Wash. 90, 84 Pac. 632;
*Etheridge v. Gordon Const. Co.*, *supra*; *Engelking v. Spo-
kane*, 59 Wash. 446, 110 Pac. 25, 29 L. R. A. (N. S.) 481;
*Jobe v. Spokane Gas & Fuel Co.*, *supra*.

This is the almost universal rule where the servant is
proceeding upon a direct order from the master or the
master's representative. In such cases the servant only as-
sumes the risk when the danger is open, obvious and apparent
alike to man and master, equally appreciated by both, and is
so imminent and certain of disastrous consequences as to
make it incumbent upon the servant as an ordinarily prudent
man to either quit work or be held to assume the risk. "The
rule of the prudent man" becomes the determinative prin-
ciple. *Liedke v. Moran Bros. Co.*, 43 Wash. 428, 86 Pac.
646, 117 Am. St. 1058; *De Mase v. Oregon R. & Nav. Co.*,
40 Wash. 108, 82 Pac. 170; *Goldthorpe v. Clarke-Nickerson
Lum. Co.*, 31 Wash. 467, 71 Pac. 1091; *Dean v. Oregon R.*

*& Nav. Co.,* 38 Wash. 565, 80 Pac. 842; *Dumas v. Walville Lum. Co.,* 64 Wash. 381, 116 Pac. 1091; *Nelson v. Ballard Lum. Co.,* 60 Wash. 690, 111 Pac. 882; *Howland v. Standard Milling & Logging Co.,* 50 Wash. 34, 96 Pac. 686; *Anustasakas v. International Contract Co.,* 57 Wash. 453, 107 Pac. 342; *Bailey v. Mukilteo Lum. Co.,* 44 Wash. 581, 87 Pac. 819; *McGovern v. Central Vermont R. Co.,* 123 N. Y. 280, 25 N. E. 373; *Chesson v. Roper Lum. Co.,* 118 N. C. 59, 23 S. E. 925; *Bunker Hill etc. Co. v. Jones,* 130 Fed. 813.

In view of these principles, it seems plain that the question of assumption of risk was one for the jury. The respondent, if his testimony and that of his witnesses is to be believed, had seen this work performed, as he attempted to perform it on the day in question, for sometime without disastrous consequences. He was a man, so far as the record shows, of no particular knowledge as to the tensile strength of the rods upon which the forms hung when loosened and shoved out from the face of the pier. He was ordered to do the work, and proceeded to do it in the manner which he and his witnesses claim was usual. Moreover, the evidence shows without contradiction that he did not know that only three of the rods passing through the forms in question were embedded in the concrete. There was no evidence that his prior work, either by reason of its nature or location, was such as to lead him to observe that fact. The evidence shows that this was the first time that any of the forms had been so placed as to leave any of the rods outside of the concrete when poured. His position upon the form was such that he could only see the projecting ends of the rods, and there is absolutely no evidence that he knew or was warned of the fact that any of the rods were not embedded in the concrete as usual. This element of the danger, which the jury might well have found was the efficient factor in the catastrophe, was not open, obvious or apparent to the respondent, though well known to the appellant's foreman. Whether, with such knowledge as he had, he acted as a reasonably prudent man

in obeying the foreman's order to descend upon the form, loosen it from the concrete and attempt to shove it out upon the rods, was a question of fact for the jury. It cannot be said, in view of the conflicting evidence, that, as a matter of law, he assumed the risk consequent upon obedience.

(3) Was the respondent guilty of contributory negligence? We think that a fair preponderance of the evidence shows that he was doing the work in hand at the time of the accident in the manner which had been usual throughout the work to that time. The evidence, as we have seen, was conflicting as to whether or not any direction was given by the foreman to attach the block and tackle to the form, or to tie it with ropes to the form above. Whether the respondent was guilty of contributory negligence in obeying the order is determinable upon the same principles as those determining the question of assumption of risk. If in so doing he acted as an ordinarily prudent man would have acted under the same conditions, he was not guilty of contributory negligence. *Knudsen v. Moe Brothers*, 66 Wash. 118, 119 Pac. 27; *Rogers v. Valk*, 72 Wash. 579, 131 Pac. 231; *Cook v. Chehalis River Lum. Co.*, 48 Wash. 619, 94 Pac. 189. The question was one for the jury.

Several assignments of error are based upon certain instructions given by the court, and the refusal to give certain instructions requested by the appellant. We have carefully examined the instructions given and find that they fully and clearly state the law as applied to the evidence. What we have said touching the evidence disposes of every question raised upon the instructions.

(4) Finally, it is contended that the verdict was excessive. The respondent suffered a compound comminuted fracture of the left ankle. The fibula was broken into fragments, and several pieces of bone, including a part of the bone forming the ankle joint, were removed. The muscles of the calf of the right leg were torn away, and the right ankle was severely sprained. There was considerable sluff-

ing of the muscles of the right leg, which became gangrenous. Large portions of these muscles were removed, leaving a cavity sufficient to contain a man's hand. The large muscles of the leg are permanently impaired, and there is nothing known to medical science which will change the respondent's present condition. There was a fracture of the eighth rib on the right side, causing an adhesion of the serous membrane of the lung cavity to the outer surface of the lung, which greatly interferes with respondent's respiration, and makes him liable to frequent recurrences of a pleuritic condition, which is very painful. There were numerous other cuts, bruises and sprains. Both of the physicians who testified as to respondent's condition stated unqualifiedly that his injuries are of a permanent nature. He was thirty-one years old at the time of the injury, and had a life expectancy of over thirty-four years. He has incurred a $300 doctor's bill. While the verdict seems large, still, in view of the evidence, we cannot say that it is so large as to indicate passion, prejudice or other improper motive on the part of the jury in assessing it. We find no ground for reversal.

The judgment is affirmed.

MOUNT, FULLERTON, MAIN, and MORRIS, JJ., concur.