64 NORMAN v. ALASKA COAST CO.

---

[No. 11946. Department One. August 10, 1914.]

CHARLES NORMAN, *Respondent*, v. ALASKA COAST COMPANY, *Appellant*.[1]

MASTER AND SERVANT—INJURY TO SERVANT—SAFE PLACE AND APPLIANCES—NEGLIGENCE—QUESTION FOR JURY. In an action by a seaman injured when a winch on which he was standing suddenly started up owing to an alleged defect in a clamp and set screw, the question of the master's negligence in furnishing safe appliances and a reasonably safe place to work is for the jury, where it appears that the servant's position on the "fleeting drum" of the winch was, owing to the crowded condition of the deck, the only practicable way to perform the work in hand, that it was impossible to tell by looking whether the steam operating the winch was on or off, and that while there was testimony to the effect that the winch had been repaired shortly before and was in good repair, other testimony showed such repairs, if made, were not properly made, and that the clamp and set screw, designed to hold the lever in place, were defective.

SAME—CONTRIBUTORY NEGLIGENCE. Whether the servant was negligent in taking his position on the "fleeting drum" of the winch was a question for the jury.

SAME—ASSUMPTION OF RISK. The fact that the servant was an expert winchman, and that the winch was open to examination, would not charge him with negligence, as a matter of law, in stepping upon the "fleeting drum" of the winch without orders to do so, but the question was one for the jury, the servant having run the winch only a short time, had not set the lever, and did not know

[1]Reported in 142 Pac. 434.

whether the steam was on or off; since he had a right to assume that the lever and set screw were in proper condition, and that the winch would remain idle until some one set it in motion.

SAME—CONTRIBUTORY NEGLIGENCE—UNSAFE METHOD OF WORK—QUESTION FOR JURY. The evidence shows that a servant was not negligent in choosing an unsafe way in performing certain duties, where he chose the only practicable way and the usual and customary one, and that had he chosen an alleged safer way, he would have been unable to perform the work.

SAME—CONCURRING NEGLIGENCE OF FELLOW SERVANT. If the negligence of the master concurs with that of a fellow servant in causing an injury, the master is liable.

SAME—DEFENSES—INDUSTRIAL INSURANCE ACT—COMPLIANCE WITH ACT. It is no defense, in an action for injuries to a servant, that the case falls within the industrial insurance act, where the defendant failed to allege or prove compliance with the act.

DAMAGES—PERSONAL INJURIES—EXCESSIVE VERDICT. A verdict for $5,000 for injuries to a seaman, thirty-eight years of age, and earning $80 a month with board, is not excessive, where he suffered a fracture of both bones of the right leg near the ankle, and a dislocation of the knee; he was in the hospital for seven months, where he underwent several operations on account of his injuries, and was, at the time of the trial, twenty-one months after the injury, unable to resume his occupation as a sailor, the medical testimony showing that the injury would likely prove permanent, and that it would be a year or more before he could resume his former occupation.

Appeal from a judgment of the superior court for King county, Dykeman, J., entered January 5, 1914, upon the verdict of a jury rendered in favor of the plaintiff, in an action for personal injuries sustained by a seaman in loading a ship. Affirmed.

*W. C. Morrow* and *Richard Saxe Jones*, for appellant.

*Gill, Hoyt & Frye*, for respondent.

Gose, J.—Plaintiff brought this action to recover damages for personal injuries sustained while in the employ of the defendant. He was successful in the court below. The defendant has appealed.

The respondent, a few days before he sustained the injury, had entered the service of the appellant as an "able seaman," upon the steamship Jeanie, which was loading for ports in Southwestern Alaska. He is an experienced sailor and winch tender. The Jeanie is equipped with three winches, a double winch and a single winch on the forward deck and a single winch at the stern. The respondent was injured on the forward single winch. One Haynor drove the double winch, Campbell drove the single forward winch, and the respondent drove the winch at the stern of the vessel.

The winches are operated by steam by means of cables revolving upon drums, and which run through blocks attached to the ship's mast. In order to load a heavy piece of machinery, it became necessary to put all the winches in operation. To this end, the first officer, according to witness Haynor, gave an order "to double up and get a block as quickly as possible." Witness Campbell said the order was "to double the falls in order to lift the load." And again he said it was to "make fast everything and to double up." The respondent said the order was "to get a block and double up; to connect it up to the mizzenmast." Again he said it was "to belay everything and make it [the block] fast, and he told me to make a couple of straps." The first officer testified that his order "to the sailors" was "to get up a gantline . . . and take it aloft and reeve it through the gantline block and send it down in order to lift up a cargo block to fix at the mast head." The order was general to all the sailors, and while they do not tell it in the same words, it meant for them to quit other things and connect up the single winches as soon as possible, so that the heavy piece of machinery might be put aboard, it being the last piece to be loaded. The witness Haynor, in obedience to the order, took a pulley block and a lifting line up to the cross-trees on top of the mast, and rove the line through the block, and let it fall for the purpose of taking up the cargo block. The line fouled at the goose neck of the boom. The respondent stepped onto the

"gypsyhead" or the "niggerhead," otherwise called the "fleeting drum" of the forward single winch, reached for the line, and the lever to the winch, which had been standing at center for about twenty minutes, fell and the winch started. The respondent was caught in the bight of the cable, thrown to the floor, and injured by the revolving drum. The respondent, in detailing the situation and in explaining why he did not step on the metal-covered cog wheels, said:

"Mr. Haynor was on top leaving the gantline down, and I had to take a pulley or snatch block down. We always take a gantline down and send it on to pick up heavy things like that. And he was on top and Mr. Marquette was on the other side there; and he was leaving that gantline down to me and that was the only place to get it. There was a big steam launch on the deck right there and there was gasoline drums on top of this right here, the height of this was eighteen inches or two feet high, and the gasoline drums were right on the top, and they are four or five feet high, and this is the only place here that I could stand, right here below; I could not get at it and the wind was blowing and he was trying to get it down, and he was getting it tangled between the two booms, and the only way I could get it was to get on the gypsyhead, so I stepped up there with my left foot that way, and my right foot that way, and the lever was over here, and the lever fell down, and my foot got jammed up in this and I was thrown over."

In answer to the question, "You say there were gasoline drums there on the deck?" he answered, "Yes, there were gasoline drums, and a steam launch and a lot of lumber and everything. We had a big deck load; it was over everything." Other witnesses gave like testimony. Respondent testified that he had operated the winch a short time in the forenoon, but that he did not set the lever. He further said that he did not know whether the steam was on or off when he stepped upon the winch. He said he knew that, if the steam was on and the lever fell, the winch would start; that he did not look, but obeyed orders. He said, if the clamp and set screw which held the lever in place were right, the lever

would stand. A witness for the appellant, a machinist, said that one could not tell by looking whether the steam was on or off, unless the steam was escaping, and that it would not escape if the winch was right. Witness Campbell testified that the winch was defective, and that the set screw which is designed to hold the lever was in disrepair. The respondent's witnesses united in saying that, owing to the crowded condition of the deck, the respondent took the only practicable way of reaching the gantline.

The negligence charged is, (a) that the clamp and set screw which were designed to hold stationary the lever which operated the winch were defective; (b) that the appellant should have had the steam turned off the winch or should have left Campbell, the tender of the offending winch, at his post; and (c) that the appellant failed in its duty to use reasonable care to furnish the respondent a reasonably safe place to work, and failed to use reasonable care to furnish reasonably safe instrumentalities.

The appellant denied each charge of negligence, and alleged affirmatively, (a) that the respondent was guilty of contributory negligence; (b) that he assumed the risk; and (c) that his injury was caused by the negligence of a fellow servant. At the close of the respondent's case, the appellant moved for a nonsuit, which the court denied.

The appellant now contends, (1) that the evidence did not warrant the jury in inferring its negligence; (2) that the respondent was guilty of contributory negligence; (3) that he assumed the risk; (4) that he voluntarily chose an unsafe way when there was a safe way at hand; (5) that his injury was caused by the negligence of a fellow servant; (6) that the case is controlled by the industrial insurance act; (7) that the court erred in giving certain instructions to the jury; and (8) that the verdict is excessive. These propositions will receive consideration in the order stated.

(1) In respect to the negligence of the appellant, it is familiar law that it is the duty of the master to use reason-

able care to furnish the servant with a reasonably safe place to work. A like duty devolves upon the master in respect to the instrumentalities which are furnished for the servant's use. Whether the appellant met this duty is a question of mixed law and fact, and hence presents a question for the jury. If the clamp and set screw were defective and the appellant knew it, or if, in the exercise of reasonable care, it ought to have known it, and it failed to warn the respondent of the danger or to take reasonable precautions to prevent his injury, it was guilty of negligence. It claims that the instrumentalities were not defective, and that it had had the winch repaired by competent workmen about two weeks before the accident. The clamp and set screw were designed to hold the lever stationary. This they failed to do. The witness Campbell testified that they were defective. If his testimony is true, it shows that the winch had not been carefully repaired. What is reasonable care in a given situation is a question of law only where but one conclusion may be drawn from the evidence. If different minds may honestly reach different conclusions, the question is for the jury. *Thoresen v. St. Paul & Tacoma Lumber Co.*, 73 Wash. 99, 131 Pac. 645, 132 Pac. 860; *Wainwright v. United States Lumber Co.*, 73 Wash. 222, 131 Pac. 820. While the question is a difficult one, we are constrained to hold that the court was warranted in submitting it to the jury.

(2) The same principle applies to contributory negligence. *Williams v. Spokane*, 73 Wash. 237, 131 Pac. 833.

(3) The appellant concedes that the court correctly instructed the jury on the question of assumed risk, but insists that, the respondent being an expert winchman, and the winch being "open, uncovered and capable of complete examination," the respondent was guilty of negligence as a matter of law in stepping upon the "fleeting drum" of the winch "without any order and of his own volition," citing, among other cases, *O'Dell v. Northern Coast Timber Co.*, 63 Wash. 546, 115 Pac. 1085, and *Cole v. Spokane Gas & Fuel*

*Co.*, 66 Wash. 393, 119 Pac. 831. In the *O'Dell* case, the plaintiff was ordered by the foreman to flag an approaching train. There was a wire cable lying across the railroad track. The plaintiff took a position near the cable but on the opposite side from the train, and gave the signal. The signal was not heeded, and the moving train caught the cable, causing it to strike and injure the plaintiff. Upon these facts, we held that the plaintiff voluntarily took a position so obviously dangerous that he could not recover. In the *Cole* case, the plaintiff dropped a pan filled with coke, and was injured. He testified that the handle of the pan slipped in his hand. The evidence showed that he carried the pan many times a day. We held that, the pan being a simple instrument, it was the duty of the servant to know its condition and either have it repaired, if repairs were necessary, or report the disrepair to the master. It is apparent, we think, that there is little analogy between those cases and the case at bar. The respondent had operated the winch only a short time, and had not set the lever. He had a right to assume that the lever and set screw were in proper condition, and that the winch would remain stationary until some one set it in motion. He did not know whether the steam was on or off. A witness for the appellant said that one could not tell by looking whether the steam was on or off of the winch. The question was properly submitted to the jury.

(4) The testimony does not tend to show that the respondent voluntarily chose an unsafe way in attempting to get the line when a safe way was at hand. It shows, on the contrary, that he chose the only practicable way in view of the surrounding conditions. Moreover, it shows that he followed the usual and customary way. It is suggested in the briefs that he should have stepped upon the large metal-covered cog wheel, and that this would have been a safe way. He testified that he could not have reached the line from that position. Other witnesses said that he could not have stood on the rim of the cog wheel, because there was nothing for

him to hold on to while reaching for the gantline. Before hearing the testimony, upon stipulation of counsel, the jury was sent to inspect the ship, the machinery of which was admittedly in the same situation as when the accident happened. The jury, therefore, had an opportunity to test the truth of the respondent's testimony from their own observations.

(5) There is no evidence that the injury was caused by the negligence of a fellow servant. However, if the negligence of the master concurred with the negligence of a fellow servant in causing the injury, the master is liable. *Hanson v. Columbia & Puget Sound R. Co.*, 75 Wash. 342, 134 Pac. 1058.

(6) The contention that the cause falls within the industrial insurance act cannot be sustained. The appellant neither alleged nor proved that it had complied with the act. Indeed, it did not suggest in the court below that it fell within the protection of that law. *Acres v. Frederick & Nelson*, 79 Wash. 402, 140 Pac. 370; *Reynolds v. Day*, 79 Wash. 499, 140 Pac. 681.

(7) The court, among other things, instructed the jury that the duty of the master to use reasonable care to furnish the servant with a reasonably safe working place is a nondelegable one. It also instructed that, as a matter of law, the appellant knew of all the defects in the winch which the exercise of reasonable care upon its part would have disclosed. We cannot, within the reasonable limits of an opinion, review the appellant's several objections to the instructions; nor can we set forth the instructions, or their substance, further than to say that, taken as a whole, they voice the view we have expressed.

(8) The last contention is that the verdict was excessive. There is no conflict in the testimony as to the nature and extent of the injury. The respondent suffered a compound fracture of the right leg near the ankle. Both bones were broken, and the knee was dislocated or the large ligaments

were torn loose. He was in the hospital about seven months, used a crutch thereafter for three months, then a cane for four or five months. He was unable to work for about twenty months, and had done nothing but very light labor at the time of the trial. His leg was cut open and the bones were scraped three or four times while he was in the hospital. He testified at the trial that he could not use his leg to any extent on account of the condition of his knee, and that he could not work as a sailor. He was thirty-eight years of age and earning on an average $80 a month with his board, when he was injured. He had a life expectancy of approximately twenty-nine years. The verdict and judgment were for $5,-000. Dr. Underwood testified that, at the time of the trial, twenty-one months after the injury, the knee was "quite bent and he cannot bear the weight of the body on the bended knee now;" that it would take years "for full recovery;" that there will always be a weakness in the knee under any great strain, and that the disability to a certain extent is permanent. Dr. Cook, in answer to an inquiry as to how much time would elapse before the respondent could resume heavy manual labor such as a sailor is required to perform, or whether he would ever be able to perform such labor, said, "He is not able to use it [the leg] in hard work now, and it is very problematical how long it will be." He was asked, "Under the most favorable circumstances, how long would it be before he would have the full use of it as to strength?" and answered, "At the rate he is recovering, I should judge it would be a year or more before he can do any work as a sailor." Upon this testimony, we do not feel justified in disturbing the verdict.

The argument has taken a wide range, and other questions are suggested which are closely correlated with those already considered. We do not think they merit special consideration. The judgment is affirmed.

CROW, C. J., ELLIS, CHADWICK, and MAIN, JJ., concur.