King, J.,
delivered the opinion of the court.
The Centennial Irrigating Ditch Company, a Colorado corporation, obtained a decree of the district court in and for the county of Costilla, changing the point of diversion of seventy-five cubic feet of water per second of time from the headgate of the Centennial ditch, through which it had been diverted for thirty-five years or more, to another point about two miles further up the Rio Grande river. The Monte Vista Canal Company, The San Luis Valley Irrigating District, The Rio Grande and Piedra Valley Ditch Company, and others, junior appropriates, protested against the change prayed for, and appealed from the judgment granting the same.
1. Appellants deny the right and capacity of the petitioner to maintain this statutory proceeding, the denial of such capacity being predicated on the fact that petitioner was neither the owner nor user of water for *498 the purpose of irrigation. The statute invoked reads as follows:
“Section 1. Every person, association or corporation desirous of changing, in whole or in part, the point of diversion of his or its right to use water from any of the streams of the state shall present a petition to the district court from which the original decree issued, * * * praying that such change be granted.” — Session Laws 1903, page 278.
Independent of the statute, and prior to its enactment, any person or corporation having the right .to divert water from the natural streams of this state had also the qualified right to change the place of its diversion, but subject to the condition that the vested rights of others to the use of water from such stream should not be injuriously affected thereby; and after an adjudication of the water rights under our system of determining priorities as between ditches, subject to the further condition that an order or decree of court permitting such change be obtained. This promissory decree becomes, in effect, a modification of the general adjudication decree, in so far as the place at which the water may.be diverted through any.ditch is changed from that fixed in the general decree, and without which modification-the state officers charged with the distribution of water may not deliver it elsewhere. The petitioner was the owner of the Centennial ditch. Under a general adjudication, about eighty second feet of water was permitted to be diverted from the stream at a point there designated, and thence to flow into and through said ditch, for the use of the persons lawfully entitled thereto. • Petitioner was a corporation. or association known as a mutual ditch company, carrying water for the use of its stockholders only, maintaining and operating the ditch solely for their use and benefit, and, although it owned no land except for its right of way, and as a corporation irrigated no land for *499 its own nse, nevertheless we think that by virtue of its relation to its stockholders in whom was vested the “right to the use of water from the stream,” the corporation had the right, as trustee for such stockholders, to institute and prosecute the proceeding.
Moreover, we think the statute, in so far as it relates to the person who may pray for a change, has the same meaning as if it had provided that ‘ ‘ every person, association or corporation desirous of changing, in whole or in part, the point of diversion of any water which Be or it has the right to divert from any of the streams of the state, shall present a petition,” etc.'
2. It is not shown that all appropriators of water from the Eio Grande river in said water district, junior in right to petitioner, were served with notice of the hearing on the petition, and for that reason it is urged that the court did not obtain jurisdiction to try the issues. The court found that all persons whose rights would be affected had been duly notified. This finding was based upon a showing of service upon a multitude of persons and corporations, and as there is slight, if any, evidence in the record to overcome that finding, it will not be disturbed.
3. That the evidence does not warrant the decree appealed from is quite clear. It is settled law that a person who seeks to obtain an order of the court changing the point of diversion of his adjudicated water right must prove by competent and sufficient evidence that the change sought will not injuriously affect the vested rights of others. The burden of proof in the proceeding is upon the petitioner, and not upon the person who resists the application for such change. — Fort Lyon Canal Co. v. Chew, 33 Colo., 392, 81 Pac., 37; Vogel et al. v. Minnesota Canal Co., 47 Colo., 534, 107 Pac., 1108; New Cache la Poudre Irrigating Co. v. Water Supply & Storage Co., 49 Colo., 1, 111 Pac., 610; Farmers’ High Line etc. Co. v. Wolf, 23 *500 Colo. App., 570, 578, 131 Pac., 231. The petitioner did not bear this burden. On its behalf, two witnesses gave as their opinions that the change contemplated would not injuriously affect others; but such opinions were not based upon any facts or conditions testified to by them, or otherwise in evidence at the time they were given, from which such inference can by any exercise of the imagination be drawn. The question of resulting effect (whether injurious or non-injurious) is the ultimate fact to be ascertained and determined by the court from all the evidence; that fact is its conclusion, reached by inference or deduction from evidence of conditions that prevailed before the change, and of conditions that will prevail thereafter. It must be obvious that the mere expression of opinion by a witness, or witnesses, will not satisfy the requirement- of the rule as to prima facie showing and the burden of proof in a proceeding of this kind. Protestants’ motion for non-suit and dismissal of the petition, submitted when petitioner closed its evidence in chief, might well, and we think should, have been granted; but, having been denied, the protestants, appellants here, assumed the burden of showing injury to their vested rights to the use of waters of the stream, and, we think, successfully carried it.
An extended or detailed statement of the evidence would serve no useful purpose. A brief review thereof will suffice. The testimony on all material conditions and circumstances is practically undisputed. It shows that the Centennial ditch, as theretofore used, was located upon the lowlands near the river; that practically all land irrigated therefrom was what is called “first bottom” lands lying between the ditch and the river, and so situated that all seepage and other return waters reached the river certainly and quickly after irrigation, and above the headgates of several other ditches having decrees in the aggregate exceeding 100 second feet of water, much, *501 if not all, of which, was senior in priority to some of the protestants ’ water rights; that these return waters were, and always had been,.large in amount,' augmenting the waters of the stream to such an extent that one ditch having an early priority of forty-five second feet was supplied entirely from the return waters from the Centennial ditch after its stockholders had been irrigating for about twenty days, and other such ditches were also supplied in whole or in part. It is further shown by the evidence that the lands under the Centennial ditch, with few exceptions, have been and are what is known as natural hay lands, extending to or near the river bank; that the waters have been poured upon such lands in floods, and, hastening over them, returned to the river, diminished but slightly in quantity as compared to the diminution under ordinary methods of irrigation as applied to other crops. This accounts for the unusual, and apparently excessive, amount of return waters to which the witnesses testified. These conditions and consequences were shown by water commissioners and other disinterested witnesses, and were not disputed. The direct effect of this supply. to ditches below the Centennial ditch has been — and manifestly will continue to be, if point of diversion be not changed — that other ditches farther up the stream, including some of the appellant’s, are supplied with water for a longer time each season than would be possible if the senior rights below the Centennial ditch are to be filled from other waters of the river, as they must be, should the return waters mentioned be withdrawn. It was further shown that at the new location, if the change be made, the water will be taken out of the stream and carried to and upon a mesa or upland for a number of miles, and then that approximately forty second feet of the water will be carried across a divide to and used upon a large body of land from which the seepage and other return waters will flow into Rock creek and *502 Spring creek, and thence into the Alamosa river, and by it be discharged into the Bio Grande river far below any point where any portion thereof can be utilized by any of the ditches in said water district. It is further shown by the evidence, and undisputed, that the Centennial ditch, where located, was and is supplied with a considerable amount of water reaching it along its course, arising from seepage from irrigation upon the higher lands, and for that reason would not require as large a draft upon the river to supply the needs of the lands under the ditch as it otherwise would; that this source of supply will not be available for the ditch at the new point of diversion, making it necessary to draw the entire supply directly from the stream. This supply was estimated to be about ten second feet during portions of the season. Upon this state of facts; the foregoing conditions surrounding the carriage and use of water for thirty-five years, and the consequences arising therefrom; the change in such conditions, and the consequences which will arise therefrom if the change in point of diversion be granted, and the carriage and use of water be as contemplated and intended, all witnesses for the appellants — and they were many — testified that a much larger draft upon the natural waters of the stream would be demanded in order to supply the ditches on the stream having adjudicated water rights; that many, if not all, the junior ditches would be shut down earlier to supply the senior priorities, and that therefore the change would necessarily, substantially and injuriously affect the rights of others to the use of water from said stream; and we think that the evidence conclusively shows that such injurious effect would be the necessary and inevitable result of the change prayed for, and granted by the trial court. It is true that some evidence was offered tending to show that, notwithstanding the’contemplated withdrawal from this ditch, and from use as heretofore, of approximately one-half *503 its decreed water rights, the land theretofore irrigated by it would in the future be irrigated by other ditches taken from the same river. That fact may, and doubtless will, lessen the quantum of loss caused by the change. But no attempt was made to show that the same quantity, or approximately the same, will be used upon said lands, and, so far as appears from this record, the injury to protestants will be substantial and inevitable. The evidence shows that a land company purchased a large body of the lands under the old ditch, and then sold the land without the water rights, or, in some instances, with a small portion thereof, intending and attempting by this'proceeding to take about one-half the waters of the ditch to another water shed, as hereinbefore mentioned.
The evidence in this case brings the petitioner within and subject to the bar of the established rule that, as against the change sought, the junior appropriators have a vested right to the continuance of conditions that existed on the stream at and subsequent to the time they made their appropriations, including the general method of use of water therefrom. — Vogel et al. v. Minnesota Canal & Res. Co., 47 Colo., 534, 107 Pac., 1108; Larimer Co. Canal v. Poudre Valley Res. Co., 23 Colo. App., 249, 129 Pac., 248; Farmers’ High Line etc. Co. v. Wolf, 23 Colo. App., 570, 131 Pac., 231.
The judgment of the trial court seems to be predicated upon the following findings of fact and law:
“It appears that the purpose of wanting to make this change is to get the new ditch on higher ground and for the purpose of taking a portion of the waters of this ditch, or of the decree, from lands near the river and using these waters on lands further from the river. The lands'from which a portion of these waters are to be withdrawn are to be irrigated with water taken from the same river through another ditch. It is objected that a portion of these waters, carried further away from the river *504 for use in the irrigation of other lands, will return to the river, by seepage, or otherwise, further down the river, and, by reason of that, vested rights will be injured.
“There is some contention also, that it may take more water to irrigate the farm lands further away from the river than is required for the meadow lands nearer the river. If we may take judicial knowledge of the records of this court, it must appear that a great many ditches and canals, inclusive of the ditches of these objectors, carry water much further from the river, for use in irrigation, some of them taking water ten, twenty, thirty or even forty miles away from the river, and I think it is well known by all who have given any careful attention to that, that instead of this fact proving an injury, it has proven beneficial, for the reason that the greater the area that is covered with water in irrigation, the more water finds its way back to the river as seepage, in seasons of the year when water becomes scarcer: That the river carries more water by reason of this seepage, upon account of the enlarged area that is covered by water in irrigation. The water which might otherwise flow away and leave the country, in times of sufficiency of water, would instead, by reason of a large area being irrigated,, be seeping back by means of percolation and seepage, reaching the river during all portions of the year, so that the flow in the river would be more nearly equalized during the entire season.
“It is the opinion of the court that the change that is here asked for can do no injury to any vested rights, but that the tendency would be to benefit vested rights, rather than to injure.”
We may readily concede the correctness of the views expressed by the learned trial judge, that, as a whole, the vast territory irrigated or to be irrigated from the Rio Grande river may be benefited in general by the application of water during flood seasons to the largest possible *505 area of irrigated lands; that thereby the soil of the entire area becomes a vast reservoir from which the water has a tendency to return slowly to the stream at some point in its course, and thereby many more acres, as a whole, may be irrigated than if the water were permitted to run off; but the fact that many more acres and people may be served by this means of storage cannot avail as against the injury to protestants in this case, whose junior decreed rights are shown to be injuriously affected. There is absolutely no evidence in this case from which it can be inferred that the vested rights of the protestants will be benefited; and the fact, if it be a fact, that the vested rights of others may be benefited, is not material to the issues of this case; and, while it is true, as we have heretofore said, and as the court finds, that the lands formerly irrigated from the Centennial ditch will still be irrigated, there is nothing to show that the same quantity of water, or anything like it, is to be used thereon; and, as against the showing made by the protestants,-the burden of proof was upon the petitioner to show that, notwithstanding the withdrawal of approximately forty cubic feet of water per second of time from the irrigation of those lands by the contemplated change, substantial injury would not inevitably result to the junior appropriates. Furthermore, the finding and judgment of the court seems to be in part the result of certain judicial notice or knowledge which the trial judge took of the records of his court, which were not in evidence nor in any manner accessible to this court upon review; but courts cannot go outside of the record and speculate as to the effects of what might be shown had evidence been adduced, but can only determine matters from the allegations and proofs submitted to them. The personal knowledge of the judge who tries the case cannot meet the requirements of the law that proof of necessary facts shall be made.— *506 Utah Nursery Co. v. Marsh, 46 Colo., 211, 103 Pac., 302; People v. Hard Land Co., 51 Colo., 260, 117 Pac., 141.
This court hesitates in any case to substitute its conclusions for those of the trial court as to the effect which will be produced by certain admitted or proven facts, but as we view the case from the record, our duty is clear. In view of the conclusion we have reached, other matters raised by the assignments of error need not be decided.
The judgment will be reversed and the cause remanded, with directions to deny the petition.

Reversed and Remanded.